******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARCELLO E.*
(AC 44211)

Alvord, Suarez and Bishop, Js.

*Syllabus*

Convicted of the crime of assault in the first degree in connection with the stabbing of the victim, his former partner and the mother of their two children, the defendant appealed to this court. He claimed that the trial court improperly admitted certain evidence of his alleged uncharged misconduct that pertained to two altercations he had with the victim prior to the date of the charged crime. Prior to trial, the state, pursuant to the applicable provision (§ 4-5 (c)) of the Connecticut Code of Evidence, sought to admit evidence of four prior altercations between the defendant and the victim for the purpose of establishing the defendant's intent to commit the charged crime. The trial court admitted evidence of two of the altercations, which occurred two and three years before the stabbing. In one incident, the victim sustained a concussion after the defendant punched her in the face; in another incident, he punched her in the mouth in the presence of their minor daughter. On appeal, the defendant claimed that the uncharged misconduct was not relevant to intent or similar in nature to the charged crime, and that the uncharged misconduct was more prejudicial than probative and, thus, harmful. *Held* that the trial court did not abuse its discretion in admitting uncharged misconduct evidence involving two prior altercations between the defendant and the victim, as that evidence was relevant and probative and, thus, admissible to prove his intent to assault the victim by stabbing her: the court reasonably could have found that the prior misconduct was sufficiently probative of intent because it involved the same victim and was of a similar nature as the charged conduct, which involved repeated stabs to the victim's head and body, evidence that the defendant previously struck the victim made it more likely that he intended to cause her serious physical injury by stabbing her, as the prior misconduct, which was not too remote, was probative of his attitude toward her well-being, and, contrary to defendant's assertion, the admission of the prior misconduct did not run afoul of the Supreme Court's determination in *State* v. *Juan J.* (344 Conn. 1) that uncharged misconduct is inadmissible to prove intent in general intent crimes; moreover, this court could not conclude that the trial court abused its discretion in determining that the probative value of the misconduct evidence outweighed its prejudicial effect, as the conduct and injuries underlying the misconduct, which did not involve the use of a weapon, were substantially less severe than that involved in the charged crime and were not likely to arouse the jurors' emotions so as to create undue prejudice, the misconduct evidence was litigated out of the jury's presence and did not consume an undue amount of trial time or create side issues, the state's questioning of the victim about it was limited and not inflammatory, and the defendant was not unfairly surprised by the misconduct evidence; furthermore, the court instructed the jury on three occasions that it could consider the misconduct evidence solely on the issue of intent, thereby restricting the state's use of the misconduct and limiting its prejudicial effect, the defendant's alibi that he was asleep at home when the stabbing occurred rested on his testimony and that of his mother and sister, which was contradicted by the testimony of investigating police officers that his mother and sister were not cooperative and would not provide them with any information, and, even if the court improperly admitted the misconduct evidence, in light of the strength of the state's case and the tailored introduction of the uncharged misconduct evidence, this court was left with a fair assurance that the evidence did not substantially affect the verdict.

(*One judge dissenting*)

Argued March 8—officially released October 18, 2022

*Procedural History*

Substitute information charging the defendant with the crime of assault in the first degree, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Gold, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*John R. Weikart*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Anthony Bochicchio*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Marcello E., appeals from the judgment of conviction, rendered after a jury trial,[1] of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal, the defendant claims that the trial court improperly admitted uncharged misconduct evidence. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The defendant and the victim met and began dating around 1995 when the victim was fifteen years old. The defendant and the victim had two children together, J, who was born in 1998, and S, who was born in 2003. At the time of S's birth, the defendant and the victim lived together in Hartford; they later moved, briefly, to South Windsor. In 2008, the defendant and the victim began to have problems in their relationship. The couple had several arguments that evolved from verbal disagreements to physical incidents. Following one such incident in October, 2009, the defendant stopped living with the victim and their children.

In November, 2011, the defendant resided at his mother's home with his mother, sister, nephews, and brother on B Street in Hartford. He and the victim had an arrangement wherein the defendant would pick up S from school, after 3 p.m., and bring her to his mother's house until the victim left her workplace. After the victim left work at about 5 p.m., she would pick up S at the home of the defendant's mother and then return to their home on M Street in Hartford. When the victim arrived at the home of the defendant's mother to pick up S, the victim typically would not go inside but instead would call S to come out because the victim "did not want to have any contact with [the defendant] at all."

On November 16, 2011, the defendant picked up S at school at about 3:45 p.m., took her to a fast-food restaurant, and brought her to his mother's home. After they arrived, the defendant went upstairs to his room. Thirty minutes before the victim picked up S, the defendant left the house with a backpack and got into a car. He did not return prior to S's leaving the house.

At about 5:30 p.m., the victim picked up S at the home of the defendant's mother. The victim and S then went to a grocery store to pick up food for dinner, which took, at most, twenty minutes. Then, they returned home to M Street, where the victim parked her car in the driveway. S got out of the car, walked to the back door, and entered the home first. The victim followed after grabbing her bag and the groceries.

The victim entered her home and turned to lock the back door when the defendant ran up to her and began stabbing her. Because the defendant was not wearing a face covering, the victim got a good look at him. The

defendant repeatedly stabbed the victim in the head, leg, arm, and back, and pulled her outside. The victim yelled for J, who was already inside the home, to come help her. J ran outside, picked up the victim, brought her into their home, and locked the door. The victim originally thought she had been beaten, but upon hearing a gushing sound and feeling her leg, she told J, "your father stabbed me." The defendant ran toward a neighbor's fence on the side of the victim's home. Shortly thereafter, S called the defendant, told him about the attack on the victim, and the phone line promptly went dead.

At 5:58 p.m., two minutes after receiving a call that someone had been stabbed on M Street, a Hartford police officer arrived at the victim's home. As part of their investigation, officers spoke with J on November 16, 2011.[2] J told the officers that the victim had identified the defendant as her assailant.

Later that evening, two police officers went to the home of the defendant's mother to speak with the defendant. Officer Valentine Olabisi first spoke with the defendant regarding his whereabouts at the time the victim was attacked. Officer Olabisi testified that the defendant had told him that "he was with his mother all day and he hadn't left the house" but "refused to speak to [Officer Olabisi] any further." Thereafter, Detective Luis Poma attempted to make contact with the defendant, but the defendant's brother told him that the defendant "was agitated." When Detective Poma then asked him for the defendant's contact information, he told Detective Poma that the defendant's phone was broken.

As a result of the defendant's attack, the victim sustained multiple stab wounds, suffered a collapsed lung, received staples extending from the top of her head down to her ear, underwent three surgeries, and was hospitalized for five days.[3] After she was transported to a hospital, stabilized by medical personnel, and administered a large amount of pain medication, the victim told the police that "she did not see the suspect" and that she had been attacked by an "unknown person."[4] Five days after the attack, the victim identified the defendant as her assailant from a photographic array that the police had prepared.

Prior to trial, the defendant filed a motion for the disclosure of any evidence of uncharged misconduct that the state would seek to present at trial. On October 31, 2019, the court held a hearing on the admissibility of evidence of four incidents in which the defendant either had threatened or used violence against the victim. At the hearing, the state presented the testimony of the victim as to the four incidents.

The victim testified that the first incident occurred on January 30, 2007, at her workplace. The defendant

showed up there and wanted the victim to "come speak to him about something that was going on" outside. When the victim refused to speak with him, the defendant entered her workplace and attempted to pull her outside. The victim ran from the defendant into a coworker's office. The defendant left the victim's place of work but continued to make threats to her over the phone. The victim did not recall the specific words he used to threaten her but recalled that they were "arguing back and forth."

The victim testified as to a second incident that occurred in March, 2008, at the home of the victim and the defendant in South Windsor. The victim was vacuuming, which "irritated [the defendant] because the vacuum was too loud." The victim asked the defendant to leave and "thought [the defendant] was leaving, and . . . he proceeded to punch [her] in . . . [the] head." The victim attempted to leave the room multiple times, but the defendant would not let her leave. According to the victim, the defendant eventually "had [her] on the ground. He punched [her] in [the] face. [She] got a concussion from that. And he just would not get out of [her] face." The victim attempted to leave the house, but the defendant pulled her back inside. She pleaded with the defendant to let her leave. The victim was eventually able to leave by saying that she needed to get their dog, who had run outside, and then ran to her neighbor's home to call the police.

The victim testified as to a third incident that occurred on October 13, 2009, at the home of the victim and the defendant when they lived in Hartford. Because the victim's car was overheating, she asked the defendant for a ride, but he did not give her one. She took her car to work, and it overheated on the highway. According to the victim, when she arrived home, the defendant acted "like nothing happened" and as though her "safety was not a concern of his . . . ." The victim and the defendant proceeded to get "into an altercation where . . . something happened, and he punched [her] in [the] face, in [her] mouth in front of [their] daughter at the time and, like, blood was like squirting everywhere." A friend arrived and brought the victim and S to the police department to file a report.

The victim testified as to a fourth incident that occurred on December 16, 2009, after the defendant no longer lived with her. The defendant called the victim to try to get her to take him back. The defendant made threats to the victim and stated, "if I go down you go down with me . . . ."

The prosecutor argued that the four prior incidents were relevant to the defendant's motive and intent to commit the charged crime and stated that there was not "enough to offer them under identity." Defense counsel objected, arguing, principally, that the incidents were not relevant to either motive or intent and that they

would be unduly prejudicial. Defense counsel argued that the incidents were not similar in nature to the charged crime because, in contrast to the prior incidents, during the charged crime, "there was no words, there was no threats. There was just an attack." Additionally, defense counsel argued, inter alia, that the prejudicial effect of the prior incidents was "[overwhelming, especially] in view of the nature of the actual allegations of the serious assault."[5]

The prosecutor argued that the incidents revealed a pattern of "escalating violence towards one particular individual which goes directly to . . . motive, which is essential, and intent, which needs to be proved." Additionally, the prosecutor argued that "the fact that [the prior incidents of misconduct] are less egregious than the incident offense, makes [them] more admissible." In responding to the defendant's argument that the misconduct evidence was not similar to the charged offense, the prosecutor argued that "similarity is important if you're looking to admit the evidence [for] identity, which we are not." Additionally, the prosecutor maintained that, were the court to admit the prior misconduct evidence at trial, he would not seek to offer any evidence of convictions or arrests resulting from the incidents or seek to elicit testimony from the victim that she had called the police.

After hearing the victim's testimony regarding the uncharged misconduct evidence and during counsel's arguments, the court requested that the prosecutor summarize the nature of the conduct that was charged in the case and the nature of the victim's testimony. The prosecutor responded: "In this case, basically, [the victim] will testify that she had come home from picking up her daughter. Her daughter went to the house first. She was going into the house. . . . [A]s she was walking in she was attacked from behind, and . . . thought at the time she was being assaulted. She didn't realize she was stabbed until the attack was over. She was stabbed several times causing serious physical injury. And she's going to testify that [the defendant] is the individual who stabbed [her]." The court further inquired whether the victim was stabbed multiple times and the location of her wounds. The prosecutor stated that she was stabbed multiple times on her head and body and that "[t]here was significant injury to her legs and to her head. She will testify, I believe, that there was no warning and no lead up . . . to it."

On the first day of trial, the court orally ruled on the admissibility of the uncharged misconduct evidence. The court stated that, "[p]ursuant to § 4-5 of the [Connecticut] Code of Evidence these prior incidents are admissible only if they satisfy the relevancy standard set forth in [§] 4-1 of the [Connecticut Code of Evidence] and [the] balancing test set forth in [§] 4-3 [of the Connecticut Code of Evidence]. Consistent with those . . .

code provisions, the court has considered the extent to which these prior incidents are relevant to the issues of intent and motive, and then undertaken to balance the probative value of each incident against that incident's prejudicial effect.

"In considering the prejudicial effect of the other crimes evidence, the court has considered such prejudice that could arise, for example, from the creation of side issues, the possible risk of jury confusion, or a risk that the jury's emotion would be so aroused by learning of these prior incidents so as to create undue prejudice. At the outset the court has recognized that as our Appellate Court has stated most recently in *State* v. *Anthony L.*, 179 Conn. App. 512 [179 A.3d 1278, cert. denied, 328 Conn. 918, 181 A.3d 91 (2018)], and *State* v. *Morales*, 164 Conn. App. 143 [136 A.3d 278, cert. denied, 321 Conn. 916, 136 A.3d 1275 (2016)], and I quote, when instances of a defendant's prior misconduct involved the same victim as the crimes for which the defendant is presently being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim and thus of his intent as to the incident in question, closed quote.

"I have also taken into account that our law makes clear that where, as here, a defendant has pleaded not guilty the defendant places in issue all elements of the charges against him including the element relating to intent. Moreover, all elements remain challenged by the defendant in the eyes of the law even if the defendant plans to pursue a defense that centers not on his mental state but on whether or not he was the perpetrator of the crime."

The court then addressed each of the four incidents of uncharged misconduct separately. The court excluded evidence of the first incident, which allegedly occurred at the victim's workplace, because "neither the nature of the physical contact [the victim] described nor the threat bears sufficiently on the defendant's intent in the present case." The court also excluded evidence of the fourth incident, the phone call on December 16, 2009, when the defendant allegedly threatened the victim by saying, "if I go down you go down . . . ." The court concluded that admitting evidence of the phone call would require the victim to contextualize and explain events that occurred two years prior to the crime at issue and would "create a risk that the jury would become confused and would certainly create side issues."

The court ruled that it would permit the state to introduce evidence of two of the four incidents, specifically, the second and third incidents. As to the second incident, in which the defendant allegedly punched the victim in the head during an argument and restrained her from leaving their home, the court found those facts "to be probative of the defendant's intent in the present

case and sufficiently probative so as to outweigh any prejudicial effect." Balancing the probative value of the evidence against its prejudicial effect, the court concluded that the incident was "not so remote in time to the charged offense to eliminate its probative value and when compared to the facts claimed in the charged case, is not such as is likely to arouse the jury's emotions." Additionally, the court concluded that, because the second incident did not involve a weapon, the jurors' emotions would not be so aroused by the behavior during that incident and that they would be able to "separate that incident from the present one." Finally, the court addressed the "dissimilarity" between the charged stabbing incident and the prior assault, and noted that courts have held "that prejudice is lessened by virtue of that dissimilarity."

The court found that the third incident, in which the defendant allegedly punched the victim in the mouth after her car overheated, was "relevant to the issue of intent in the present case." Balancing the probative value of the evidence against its prejudicial effect and relying on precedential case law, the court determined that the third incident was "not too remote, nor is it too similar to the present case, nor is it so serious as to be such as to arouse the jury's emotion." Therefore, the court concluded that evidence of the third incident was "probative of [the defendant's] intent in the present case and sufficiently probative so as to outweigh its prejudicial effects."

The court stated that it was "permitting those incidents to be considered by the jury only as to intent, not as to motive." The court further instructed the prosecutor to ensure that he did not question the victim in a manner so as to elicit information "regarding police involvement or court proceedings that may have followed the incident[s] . . . ." Additionally, the court directed that "[t]he state also shall elicit testimony regarding these two prior incidents in a non-inflammatory manner." Finally, the court stated that it was "prepared to give an instruction regarding the use to which these prior incidents may be put" and that it would do so in its final charge to the jury and immediately before or after the victim testified to these incidents, whichever defense counsel preferred. Defense counsel responded that he would prefer that the court give the limiting instruction after the victim testified.

Prior to the start of evidence, the court instructed the jury that "[s]ome evidence in this case may be admitted for a limited purpose only. If I instruct you that particular evidence has been admitted for a limited purpose, then you may consider that evidence only for the limited purpose that I explain to you and not for any other purpose." At trial, the victim testified, in less detail than during the hearing,[6] as to the second and third incidents discussed previously. With respect to

the March, 2008 incident, the victim testified that she had "asked [the defendant] to leave and it became verbal and then it became physical," and he hit her. With respect to the incident on October 13, 2009, the victim testified that she and the defendant got into an argument and that he punched her in the face.

After the victim testified, and, as requested by defense counsel, the court instructed the jury regarding the limited purpose of the uncharged misconduct evidence.[7] The court instructed the jury that it could consider the victim's testimony regarding the prior acts "solely to show or to establish what the defendant's intent may have been at the time he's alleged to have committed the specific crime charged here." Further, the court warned the jury that it "may not consider the evidence of these prior acts as establishing a predisposition on the part of the defendant to commit the crime charged or to demonstrate that he has a criminal propensity to engage in criminal conduct. You may consider this evidence of these prior incidents only if you believe it occurred, and further, only if you find that it logically, rationally and conclusively bears on the issue of whether or not the defendant had the intent to commit the crime that is charged in this case." Defense counsel did not object to the substance or timing of these instructions.

The defendant presented an alibi defense at trial. The defendant's mother and sister both testified that, on the evening the victim was attacked, the defendant was at his mother's home. They both testified that the defendant's mother called out to the defendant from the living room at about 6 p.m. but that he did not come downstairs from his room. The defendant's mother then walked upstairs and shook the defendant to wake him. The defendant's mother and sister testified that at least one police officer[8] came to their home on November 16, 2011, to speak with the defendant regarding the attack on the victim. Although the defendant's mother and sister both testified that they would have provided information to the officers on the night of the attack or at any time thereafter, had they been contacted, Officer Olabisi testified, to the contrary, that "[the defendant's mother and sister] were not cooperative, and they wouldn't provide any information."

The defendant testified in his own defense and maintained that he was not responsible for the attack on the victim. He testified that, after he brought S from school to his mother's house, he helped her with her homework, and then went upstairs to bed. He stated that the next thing he remembered was his mother waking him up. According to the defendant, S called him shortly after that, at 6:01 p.m. but the phone disconnected on her end. He testified that he was cooperative with Officer Olabisi, the first officer to arrive at the home of the defendant's mother, and that Detective

Poma called him twice that night and hung up on him.

During direct examination by his counsel, the defendant acknowledged that he and the victim had troubles in the past "like any other couples . . . ." On cross-examination, the defendant stated that he had physical altercations with the victim in the past and that, after the last incident in 2009, they stopped living together.

The following colloquy between defense counsel and the defendant took place during redirect examination:

"Q. [The prosecutor] indicated that you had a physical altercation with her in the past?

"A. In the past.

"Q. With [the victim] in the past. Correct?

"A. Yes, sir.

"Q. And you accepted responsibility for it?

"A. Yes, sir.

"Q. You pled guilty to it?

"A. Yes, sir."

During closing argument, the prosecutor reminded the jury that it could consider evidence of the defendant's prior conduct: "Now, you also heard about some prior conduct by the defendant towards [the victim]. When I asked the defendant the relationship went bad, yeah, like everybody's. But you got physical. Simple response was yes. That can be considered by you." Additionally, in setting forth the elements of the charge of assault in the first degree, the prosecutor argued that, "if you have a serious physical injury and intent to cause a serious physical [injury] . . . the question then becomes who committed the act. I'd argue that there is only evidence of one particular party that would be the defendant." During rebuttal argument, the prosecutor stated: "I can agree with [defense] counsel that the issue in this case is identification."

During closing argument, defense counsel argued: "[The defendant] said that he had a physical altercation with his wife three years before the incident. But certainly nothing even close to the level of violence we see in this case and certainly with no weapon of any type. And to his credit he took responsibility for his actions and pled guilty. If he's guilty, he pleads guilty."

After the close of evidence and closing arguments, the court, again, instructed the jury that it could consider the victim's testimony regarding the uncharged misconduct evidence only for the limited purpose of proving that the defendant had the intent to commit the crime with which he was charged.[9] The jury found the defendant guilty of assault in the first degree. The court imposed a sentence of twenty years of incarceration.[10]

By way of a motion for a new trial, the defendant renewed his challenge to the admission of the two incidents of prior uncharged misconduct evidence. He argued that "[a]llowing the jury to hear about them even for a limited purpose was much more prejudicial than probative." Additionally, he emphasized the difference between the misconduct and the crime at issue, arguing that the prior incidents were "domestic matters" that "happened about two or three years prior to the incident" at issue and "came nowhere [near] the level of violence in this case." The court orally denied the motion. Thereafter, this appeal from the judgment of conviction followed.

The defendant's sole claim on appeal is that the trial court abused its discretion in admitting evidence of his prior misconduct. He argues that the evidence was not relevant or material, and, even if deemed to have probative value, its prejudicial effect outweighed any such probative value and was harmful. In response, the state maintains that the trial court acted well within its discretion in admitting the prior misconduct evidence after finding it relevant and not unduly prejudicial. The state additionally maintains that, even if the admission of the prior misconduct was improper, the defendant has not satisfied his burden of demonstrating harm resulting from its admission. We agree with the state.

"Although [e]vidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime, such evidence is admissible if it is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior uncharged misconduct is admissible for a proper purpose, we have adopted a two-pronged test: First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Patrick M.*, 344 Conn. 565, 597, 280 A.3d 461 (2022); see Conn. Code Evid. § 4-5 ("(a) [e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person" but is admissible for other purposes, "(c) . . . such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony").

"Our standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . .

[T]he trial court's decision will be reversed only [when] abuse of discretion is manifest or [when] an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 598. "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Franko*, 142 Conn. App. 451, 460, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

The defendant argues on appeal that "this court should conclude that in the present case, where the defendant was charged with using a deadly weapon to carry out an out-of-the-blue ambush style stabbing attack on his ex, more than two years after the end of their relationship, the trial court abused its discretion by admitting evidence that he twice, during their relationship, inflicted a lesser degree of violence on her without a weapon in the context of escalating domestic arguments that resulted in much less severe injuries. . . . Moreover, where the nature of the attack, as shown by the state's uncontested evidence, left little doubt that the perpetrator of the attack on [the victim] acted with the specific intent to cause serious physical injury, and where identity of the perpetrator was the central issue for the jury, the prejudicial effect of the uncharged misconduct evidence far outweighed any marginal probative value, because the jury, in attempting to resolve the identity issue, was likely to employ an impermissible inference that the defendant had a propensity to violence against [the victim]."

We first consider the probative value of the prior misconduct evidence. The trial court found that the prior misconduct evidence from (1) the vacuuming incident in March, 2008, and (2) the car overheating incident on October 13, 2009, was "probative of the defendant's intent in the present case . . . ." We agree with the court that the evidence of uncharged misconduct was relevant to the issue of intent.

The defendant was charged with assault in the first degree in violation of § 53a-59 (a) (1),[11] which is a specific intent crime. *State* v. *Sivak*, 84 Conn. App. 105, 110, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004). Therefore, "the state bore the burden of proving the following elements beyond a reasonable doubt: (1) the defendant possessed the intent to cause serious physical injury to another person; (2) the defendant caused serious physical injury to such person . . . and (3) the defendant caused such injury by means of a deadly weapon or a dangerous instrument."[12] *State* v. *Holmes*, 75 Conn. App. 721, 740, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003).

At the outset, we address the defendant's contention that, because intent was not at issue during the trial and he pursued an alibi defense, the court abused its

discretion in admitting the uncharged misconduct evidence under the intent exception to the hearsay rule as set forth in § 4-5 (c) of the Connecticut Code of Evidence. We disagree.

"[I]ntent, or any other essential element of a crime, is *always at issue* unless directly and explicitly admitted before the trier of fact." (Emphasis in original; internal quotation marks omitted.) *State* v. *Irizarry*, 95 Conn. App. 224, 233–34, 896 A.2d 828, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); see also *Estelle* v. *McGuire*, 502 U.S. 62, 69–70, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (noting that "prosecution's burden to prove every element of [a] crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense" and holding that extrinsic act evidence is not constitutionally inadmissible merely because it relates to issue that defendant does not actively contest). "Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." (Internal quotation marks omitted.) *State* v. *Chyung*, 325 Conn. 236, 263, 157 A.3d 628 (2017).

In its oral ruling on the admissibility of the uncharged misconduct evidence, the court stated that the defendant had pleaded not guilty to the charge of assault in the first degree and that "all elements remain challenged by the defendant in the eyes of the law even if the defendant plans to pursue a defense that centers not on his mental state but on whether or not he was the perpetrator of the crime." The defendant did not directly and explicitly admit before the trier of fact that he had the intent to cause serious physical injury. Therefore, the state bore the burden of proving that the defendant had the intent to cause serious physical injury to the victim. See *State* v. *Erhardt*, 90 Conn. App. 853, 860 n.2, 879 A.2d 561 ("The defendant argues that intent was not an issue in this case because he testified that the victim injured herself and that intent was not a focus of the state's case. That argument is meritless. The defendant did not admit that he had an intent to cause physical injury; therefore, this was a contested issue that the state had to prove, and evidence regarding that issue was relevant and material."), cert. denied, 276 Conn. 906, 884 A.2d 1028 (2005). The trial court reasonably could have determined that the uncharged misconduct evidence was relevant to prove intent.

The defendant further argues that the uncharged misconduct evidence was irrelevant to whether he intended to cause serious physical injury to the victim on the night of the charged conduct because "there must be some particular, articulable connection between the uncharged misconduct and the specific intent element the state is required to prove." Specifically, the defendant claims that "[t]he absence of similarity between the charged and uncharged misconduct severely limited

its probative value . . . ." Additionally, he contends that, "even if the defendant acted intentionally in 2008 and 2009 [the years in which the uncharged misconduct incidents occurred], it is not at all clear that he acted with an intent to cause serious physical injury." The state responds that the uncharged misconduct evidence "placed their relationship in context and demonstrated [the defendant's] attitude and motivation against [the victim], and, thus, his intent to engage in an assault that caused [the victim] serious physical injury." We agree with the state.

In admitting the prior misconduct evidence for the purpose of showing the defendant's intent to commit assault in the first degree, the court relied on *State* v. *Anthony L.*, supra, 179 Conn. App. 525, and *State* v. *Morales*, supra, 164 Conn. App. 180, for the principle that, "when instances of a defendant's prior misconduct involved the same victim as the crimes for which the defendant is presently being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim and thus of his intent as to the incident in question . . . ."

In *Anthony L.*, the defendant appealed from his conviction of sexual assault in the first degree, risk of injury to a child, and sexual assault in the third degree, claiming in relevant part "that the trial court abused its discretion by admitting evidence of uncharged misconduct because the evidence was more prejudicial than probative." *State* v. *Anthony L.*, supra, 179 Conn. App. 523. On appeal, this court determined that prior misconduct evidence of the defendant's "sexual interest in the complainant, upon which the defendant acted by sexually abusing the complainant before and during the charged period," was relevant to the defendant's motive and intent. Id., 525. Specifically, this court determined that, "[w]hen instances of a criminal defendant's prior misconduct involve the same [complainant] as the crimes for which the defendant is presently being tried, those acts are especially illuminative of the defendant's motivation and attitude toward the [complainant], and, thus, of his intent as to the incident in question. . . . [Therefore] because the [prior] misconduct . . . involved the same complainant and was of the same nature as the misconduct charged, it was material to prove the defendant's lustful inclinations toward the complainant." (Citations omitted; internal quotation marks omitted.) Id., 525–26. Similarly, the court in the present case reasonably could have found that the prior misconduct evidence, specifically, the defendant's punching and hitting the victim in the head and mouth, was sufficiently probative of the defendant's intent in the present case because it involved the same victim and was of a similar nature as the charged conduct— repeated stabs to the victim's head and body. See id., 526; see also *State* v. *Erhardt*, supra, 90 Conn. App. 860 ("prior incidents of physical violence by the defendant

toward the same victim are relevant and material to indicate that he intended to cause the victim physical injury in the stabbing incident").

Our law does not require that the uncharged misconduct evidence be identical to the charged crime to be probative of the defendant's intent. See *State* v. *Erhardt*, supra, 90 Conn. App. 860 ("[t]he high degree of similarity required for admissibility on the issue of identity is not required for misconduct evidence to be admissible on the issue of intent" (internal quotation marks omitted)). In the present case, the two incidents, involving the defendant's assault of the victim by hitting and punching her, were sufficiently similar to the charged assault on the victim, which involved the defendant stabbing her. See *State* v. *Epps*, 105 Conn. App. 84, 94, 936 A.2d 701 (2007) (upholding admission of evidence of prior misconduct, as relevant to intent, involving defendant's punching and hitting victim where charged incident involved defendant's pouring gasoline on victim and igniting it, resulting in extensive burns), cert. denied, 286 Conn. 903, 943 A.2d 1102 (2008); *State* v. *Erhardt*, supra, 858–60 (upholding admission of evidence of prior misconduct, as relevant to intent, involving defendant's head-butting victim where charged incident involved defendant's cutting of victim's face with knife and holding knife to her throat).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable." (Internal quotation marks omitted.) *State* v. *Kantorowski*, 144 Conn. App. 477, 487, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013). Evidence that the defendant previously had struck the victim made it more likely that he intended to cause her serious physical injury by stabbing her because it was probative of "the defendant's attitude toward the well-being of the victim in the present case." *State* v. *Urbanowski*, 163 Conn. App. 377, 405–406, 136 A.3d 236 (2016), aff'd, 327 Conn. 169, 172 A.3d 201 (2017). We therefore conclude that the prior misconduct evidence was relevant and probative and, thus, admissible for the purpose of establishing the defendant's intent to commit assault in the first degree.

Our determination that the evidence was relevant to intent does not contravene the guidance of our Supreme Court's recent decision in *State* v. *Juan J.*, 344 Conn. 1, 276 A.3d 935 (2022).[13] In that case, the defendant was convicted of the following general intent crimes: one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), and two counts of risk of injury to a child in violation

of General Statutes § 53-21 (a) (2), arising out of two charged incidents of sexual abuse involving inappropriate touching. Id., 5. At trial, the court admitted uncharged misconduct evidence of prior incidents of sexual abuse by the defendant against the complainant for the purpose of showing the defendant's intent. Id., 8–9. Specifically, in addition to testifying regarding the two charged incidents of inappropriate touching, the complainant testified that "the defendant touched her inappropriately '[o]ver ten times,' that the inappropriate touching took place '[f]requently'; she agreed with the prosecutor that the touching took place 'about ten times and [that] it was essentially the same conduct each of those times,' and she testified that the touching continued after December 24, 2015, until she began living with [her older cousin] in June, 2016." Id., 9. The court also admitted into evidence as full exhibits video recordings of two forensic interviews of the complainant, in which she stated, among other things, that the touching occurred "all the time" and "every other day."[14] (Internal quotation marks omitted.) Id., 10. She also stated in one of the forensic interviews that "the defendant had performed oral sex on her, put his mouth on her breasts, and digitally penetrated her anus." Id.

On appeal, the defendant in *Juan J.* argued that the trial court had abused its discretion in admitting the uncharged misconduct evidence, as "intent was not presumptively at issue because he was charged only with general intent crimes, not specific intent crimes," and "intent was not affirmatively at issue because his theory of defense was that the conduct never happened at all, not that the conduct occurred as a result of unintentional actions." Id., 17.

Our Supreme Court in *Juan J.* first recognized "the fine line between using uncharged misconduct to prove intent and using it to show the defendant's bad character or propensity to commit the crime charged." Id., 20. After discussing the risk that the evidence will be used improperly, the court stated: "In light of these concerns, the state's introduction of uncharged misconduct is properly limited to cases in which the evidence is needed to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove." (Internal quotation marks omitted.) Id. The court then set forth the elements the state was required to prove and noted that all the crimes charged were crimes of general intent. See id. The court turned to a discussion of how the burden of proof differs when prosecuting general intent crimes as opposed to specific intent crimes, "in which intent is a legislatively prescribed element that the state must prove beyond a reasonable doubt unless explicitly admitted by the defendant." Id., 22.[15] Ultimately, our Supreme Court held that, "in a general intent crime case, in which the theory of defense is that the conduct did not occur at all, rather than

a theory of defense in which the conduct occurred unintentionally, uncharged misconduct is irrelevant and inadmissible to prove intent." Id., 4–5. Thus, the court's holding is not controlling of the present case, in which, as we already have explicated, the defendant was charged with a specific intent offense, and the state, at trial, bore the burden of proving beyond a reasonable doubt that he acted with the specific intent required for the commission of the charged offense. Rather, the purpose for admitting the uncharged misconduct evidence in the present case—to prove that the defendant had the specific intent to cause serious physical harm— falls squarely within the limited parameters of *Juan J.*, which permit the introduction of uncharged misconduct in cases "in which the evidence is needed to prove a fact that the defendant has placed, or conceivably will place, in issue, *or a fact that the statutory elements obligate the government to prove.*" (Emphasis added; internal quotation marks omitted.) Id., 20.

Next, we address whether the evidence was unduly prejudicial. "To determine whether the prejudicial effect of evidence outweighs its probative value, a trial court is required to consider whether the evidence may (1) unduly arouse the jury's emotions, hostility or sympathy, (2) create a side issue that will unduly distract the jury from the main issues, (3) consume an undue amount of time, or (4) unfairly surprise the defendant, who, having no reasonable ground to anticipate the evidence, is . . . unprepared to meet it. . . . We defer to the ruling of the trial court because of its unique position to [observe] the context in which particular evidentiary issues arise and its preeminent position to weigh the potential benefits and harms accompanying the admission of particular evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 600.

"We are mindful that [w]hen the trial court has heard a lengthy offer of proof and arguments of counsel before performing the required balancing test, has specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect, and has instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact . . . we have found no abuse of discretion. . . . Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct. . . . Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." (Internal quotation marks omitted.) *State* v. *Wilson*, 209 Conn. App. 779, 821, 267 A.3d 958 (2022).

The defendant argues that "admissibility for the purpose of proving intent in the present case could only have been based on reasoning that the past incidents

of violence by the defendant against [the victim] made it more likely that the defendant wanted to hurt [the victim] on November 16, 2011, and that he therefore committed the charged offense." He argues that, in this context, the evidence was equivalent to prohibited propensity evidence.[16] The state responds that "the trial court properly analyzed the prejudicial effect of admitting the prior misconduct vis-à-vis its probative value and concluded that the prior misconduct did not create undue prejudice." We agree with the state.

After a hearing on the admissibility of the uncharged misconduct evidence, the trial court carefully considered the state's offer of four incidents of misconduct and the defendant's arguments in opposition and determined that evidence of only two of the incidents was admissible. In explicating its determination as to each incident, the court expressly considered the "creation of side issues, the possible risk of jury confusion, or a risk that the jury's emotions would be so aroused by learning of these prior incidents so as to create undue prejudice." Finally, the court limited the purpose for and manner by which the state could introduce the evidence. Specifically, the court limited the state to introduction of the evidence for the purpose of intent, prohibited the state from questioning the victim "regarding police involvement or court proceedings that may have followed the incident[s]" and required the state to "elicit testimony regarding these two prior incidents in a non-inflammatory manner." See *State* v. *Patterson*, 344 Conn. 281, 296, 278 A.3d 1044 (2022) (finding significant "the degree to which the trial court exercised its discretion to limit the extent of the evidence of the prior shootings it admitted").

Moreover, in ruling on the admissibility of the two incidents of uncharged misconduct, the trial court stated that, "when compared to the facts claimed in the charged case, [the uncharged misconduct evidence was] not such as is likely to arouse the jury's emotions." Specifically, the court noted that the misconduct evidence "does not involve the use of a knife" and that it is not "so serious . . . ." In his principal brief, the defendant acknowledges that the uncharged misconduct evidence did not involve a weapon and was not as serious as the charged crime.

The trial court carefully reasoned that the conduct and injuries underlying the uncharged misconduct were substantially less severe than that involved in the charged crime. See *State* v. *Patrick M.*, supra, 344 Conn. 601 ("[t]his court has repeatedly held that [t]he prejudicial impact of uncharged misconduct evidence is assessed in light of its relative viciousness in comparison with the charged conduct" (internal quotation marks omitted)); *State* v. *Patterson*, supra, 344 Conn. 298 (same). As a result of the charged conduct, the victim suffered multiple stab wounds to her head, back,

arm, and leg, which required three surgeries and continues to cause her discomfort. Evidence that the defendant previously hit and punched the victim was far less severe than the conduct and injuries involved in the charged offense and, therefore, was unlikely to unduly arouse the emotions of the jurors. See *State* v. *Patrick M.*, supra, 601; *State* v. *Patterson*, supra, 298.

Additionally, the introduction of the uncharged misconduct evidence did not consume an undue amount of trial time or create side issues, given that only two of twenty-six pages of the victim's testimony referenced the misconduct, and the prosecutor did not belabor his examination of her. See *State* v. *James G.*, 268 Conn. 382, 401, 844 A.2d 810 (2004) (admission of prior misconduct evidence did not result in "trial within a trial" when it consisted of only twenty-five of approximately 500 pages of trial transcript and "state's attorney did not belabor his examination of [the witness]" (internal quotation marks omitted)). Consistent with the court's ruling, the prosecutor's questioning of the victim was limited and not inflammatory. See footnote 6 of this opinion. The victim testified that she and the defendant got into an argument in March, 2008, "[she] asked him to leave and it became verbal and then it became physical," and the defendant hit her. Additionally, the victim testified that, on October 13, 2009, she and the defendant got into an argument concerning her car overheating, and he punched her in the face.

Moreover, the admissibility of the prior misconduct evidence was litigated outside the presence of the jury, and the defendant does not claim that he was unfairly surprised by the evidence. The court carefully considered the state's proffer, of both the misconduct evidence and the conduct underlying the charged offense, and the defendant's objections, and ultimately permitted the state to introduce into evidence only two of four incidents in a "non-inflammatory manner." See *State* v. *Beavers*, 290 Conn. 386, 406, 963 A.2d 956 (2009) ("the care with which the [trial] court weighed the evidence and devised measures for reducing its prejudicial effect mitigates against a finding of abuse of discretion" (internal quotation marks omitted)).

Last, it is significant that the court gave a limiting instruction to the jury on three separate occasions: during its preliminary instructions, after the victim testified to the uncharged misconduct evidence, and in its final charge to the jury. By instructing the jury to consider the evidence solely on the issue of intent, the court restricted the parameters of the state's use of the prior misconduct evidence, thereby limiting its prejudicial effect. See footnote 7 of this opinion; see also *State* v. *Kantorowski*, supra, 144 Conn. App. 492 (court did not abuse its discretion in admitting uncharged misconduct evidence where "the court heard a detailed offer of proof and arguments of counsel before it performed

the required balancing test" and confined state's use of uncharged misconduct evidence to limit prejudice). "Absent evidence to the contrary, we presume that the jury followed the court's limiting instruction." (Internal quotation marks omitted.) *State* v. *Wilson*, supra, 209 Conn. App. 827.

Considering the record as a whole, we cannot conclude that the trial court abused its discretion in determining that the probative value of the prior misconduct evidence outweighed its prejudicial effect.[17]

Having determined that the prior uncharged misconduct evidence was properly admitted, we need not address the defendant's argument that the admission of that evidence was harmful. Nevertheless, even if we were to assume, arguendo, that the court improperly admitted the evidence, we agree with the state that the defendant has not satisfied his burden of proving that the admission was harmful.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Urbanowski*, supra, 163 Conn. App. 407. "[W]hether [an improper evidentiary ruling that is not constitutional in nature] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id.

The defendant argues that the admission of the prior misconduct evidence was harmful because "the state's case was not a particularly strong one." Specifically, the defendant points to the "substantial alibi evidence" that he presented at trial in comparison to the victim's "inconsistent" testimony and J's testimony that "his memory of the events . . . was poor." Additionally, the defendant contends that "it is highly likely that the evidence that the defendant had a history of violence toward [the victim] influenced the verdict" because it was "precisely the type of evidence that has the tendency to excite jurors' passions and influence their judgment." The state responds that its evidence was strong in comparison to the defendant's alibi defense

and that the trial court's "careful limitations on the introduction of the evidence reduced any harm." We agree with the state.

The state's case was strong. The victim provided a detailed account of the incident and a description of her injuries, which were corroborated by photographs and additional testimony presented by the state. Additionally, the victim responded affirmatively when the prosecutor asked her whether, on the night of the attack, she "got a good look" at her assailant. She further testified that, within minutes after the attack, she told J, "your father stabbed me." J corroborated the victim's identification and testified that he told the police, on the night of the attack, that the victim's assailant was his father. Moreover, S's testimony established that the defendant had left his mother's home thirty minutes prior to the victim's arrival and that he knew that the victim and S were heading home. Finally, when S called the defendant and told him about the attack on the victim, the defendant's phone line immediately went dead.

In contrast, the defendant's alibi defense was not corroborated by the testimony of uninterested third parties but rested on his testimony and that of his mother and sister. The alibi defense also was not based on uncontroverted evidence, for it was explicitly contradicted by the testimony of the investigating police officers. Although the defendant's mother and sister testified that the defendant was asleep in his bed at 6 p.m., a few minutes after the attack, they never mentioned that to the officers who came to their home, despite knowing that the defendant was being questioned about his whereabouts that evening. Moreover, despite the contention of the defendant's mother and sister that they would have provided information to the officers had they been contacted, Officer Olabisi testified that "they were not cooperative, and they wouldn't provide any information." Additionally, the defendant testified that he was cooperative with Officer Olabisi's requests on the night of the attack and that Detective Poma had been "harassing" him over the phone that night. In comparison, the officers testified that the defendant would not provide any form of identification upon request, that he refused to speak with them a second time because he was "agitated," and "that his phone was broken."

Moreover, the court took significant precautions to ensure that the circumstances surrounding admission of the prior misconduct evidence were fair. As previously discussed, the trial court ordered the prosecutor not to elicit evidence of what, if any, law enforcement involvement there was or criminal charges that arose out of the incidents. Defense counsel, however, elicited additional testimony concerning past physical altercations and incorporated that testimony into his closing

argument. As noted previously in this opinion, on direct examination, the defendant acknowledged in his testimony that he and the victim had troubles in the past "like any other couples . . . ." On cross-examination, he stated that he had physical altercations with the victim in the past and that, after the last incident in 2009, they stopped living together. On redirect examination, defense counsel elicited testimony from the defendant that he had pleaded guilty following a past physical altercation with the victim. During closing argument, defense counsel argued: "[The defendant] said that he had a physical altercation with his wife three years before the incident. But certainly nothing even close to the level of violence we see in this case and certainly with no weapon of any type. And to his credit he took responsibility for his actions and pled guilty. If he's guilty, he pleads guilty." Thus, defense counsel himself emphasized the challenged evidence in his closing argument.

The trial court also restricted the victim's testimony about the prior misconduct to exclude potentially inflammatory details and instructed the jury, on multiple occasions, not to consider the prior misconduct as evidence of the defendant's propensity to commit the charged crime. See footnote 7 of this opinion; see also *State* v. *Raynor*, supra, 337 Conn. 565 n.23 (noting that "limiting instructions may feature more prominently in a harmless error analysis"). The prosecutor followed the trial court's orders when eliciting testimony from the victim regarding the uncharged misconduct evidence, which was not a prominent part of the state's case. These careful limitations on the introduction of the prior misconduct evidence reduced any harm to the defendant. See *State* v. *Urbanowski*, supra, 163 Conn. App. 408–10 (lack of prominence of uncharged misconduct evidence in addition to detailed limiting instructions are factors that mitigate against finding of harm).

Last, we note that the uncharged misconduct was less severe than the charged conduct and that the prosecutor's reference to the uncharged misconduct in his closing argument was brief. Cf. *State* v. *Juan J.*, supra, 344 Conn. 33 (admission of uncharged misconduct evidence was harmful, and trial court's limiting instructions could not "cure the potential prejudice to defendant" where uncharged misconduct was "far more severe and frequent" than charged conduct and prosecutor relied on it in closing argument (internal quotation marks omitted)).

In light of the strength of the state's case in comparison to the defendant's alibi defense, and the tailored introduction of the uncharged misconduct evidence, we are left with a fair assurance that the evidence did not substantially affect the verdict. Therefore, even if the court's evidentiary ruling was improper, the defendant has failed to demonstrate that the admission of the

uncharged misconduct evidence was harmful.

The judgment is affirmed.

In this opinion SUAREZ, J., concurred.

* In accordance with our policy of protecting the privacy interests of victims in cases involving family violence, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[1] This was the defendant's second trial on the charge of assault in the first degree. This court affirmed the defendant's conviction from his first trial on direct appeal. Subsequently, the defendant brought a petition for a writ of habeas corpus, alleging ineffective assistance of trial counsel, which was denied. On appeal, this court reversed the judgment of the habeas court and remanded the case with direction to grant the petition for a writ of habeas corpus and to vacate the defendant's conviction. This court ordered a new trial, the outcome of which is the subject of the present appeal. Hereinafter, all references to the trial refer to the second trial, which took place in November, 2019.

[2] We note that the record contains conflicting information regarding J's age on the date of the attack on the victim at their home on November 16, 2011. The victim testified that her son, J, was born in April, 1998, which would support a finding that he was thirteen years old on the date of the attack. J testified that, at the time of the trial, in November, 2019, he was twenty-one years old. To the contrary, however, J also testified that, at the time he gave a statement to the police, on December 7, 2011, three weeks after the attack, he was eleven years old.

[3] At the time of the trial in November, 2019, eight years after the attack, the victim testified that she continued to have difficulty walking and was expected to undergo additional surgeries due to the severity of her injuries from the attack.

[4] Officer Chris Hunyadi was the first officer at the crime scene on the night of the attack, and followed the victim to the hospital where he spoke with her after medical personnel administered care to her for her significant injuries. Officer Hunyadi testified that he remained at the hospital until he was relieved by the lead detective later that evening. Detective Poma, the lead detective investigating the assault, testified that he was not able to take the victim's statement on the night of the attack due to her medical condition.

[5] During the pretrial hearing, defense counsel argued that the incidents were too remote in time, given that they had occurred ten or more years before trial, and that the court should consider the passage of time from the dates of the incidents to the date of the second trial, rather than the passage of time from the dates of the incidents to the date of the crime. See footnote 1 of this opinion. The defendant does not renew this argument on appeal. We note, however, that "[t]he relevant time interval for measuring remoteness is the time elapsed between the charged and uncharged misconduct." *State* v. *Acosta*, 326 Conn. 405, 407 n.2, 164 A.3d 672 (2017).

[6] The entire colloquy between the prosecutor and the victim regarding the uncharged misconduct evidence before the jury was as follows:

"Q. Now I'm going to fast-forward a bit to 2008. . . . [W]ere you now living in South Windsor?

"A. Yes.

"Q. And it was still you and the defendant and your two children that we mentioned.

"A. Right.

"Q. Now, at this point did you begin to start to begin to have some problems in the relationship?

"A. Yes.

"Q. I draw your attention to March of 2008. Do you recall getting in an argument with the defendant on that date?

"A. Yes.

"Q. And do you recall what started the argument?

"A. Yes.

"Q. Okay. What gave rise to the argument?

"A. I asked him to leave and it became verbal and then it became physical.

"Q. And that was an argument where he eventually hit you in that incident. Correct?

"A. Yes.

"Q. Now, I'm going to move up to October 13th of '09, you're now living in Hartford at that point?

"A. Yes.

"Q. And where were you in Hartford at that point?

"A. What, my address?

"Q. Yeah.

"A. [M] Street.

"Q. And still with the same two children?

"A. Yes.

"Q. And the defendant is living with you also. Correct?

"A. Right.

"Q. And did you get—I'm going to draw your attention to October 13, I believe, of 2009, did you get in an argument again on that date?

"A. Yes.

"Q. And what caused the argument on that date?

"A. My car had overheated and he went and helped me get to work that day, so that's how it all transpired.

"Q. And then there was an argument?

"A. Yes.

"Q. And at that point he eventually—he punched you in the face on that day. Correct?

"A. Yes.

"Q. Now, about that time did the defendant stop living with you and the children?

"A. Yes."

[7] The court instructed the jury: "Ladies and gentlemen, I just want to give you an instruction at this point. You recall in the preliminary instructions I gave you a short time ago, I mentioned evidence that may be admitted for a limited purpose. Just now you've heard [the victim] describe incidents that she stated occurred in 2008, and another incident that occurred in 2009, during the course of a relationship with the defendant, and that in each of those incidents that she described there was a physical assault by the defendant against her person.

"This evidence of alleged conduct of the defendant prior to the date of the charged offense, which as you know occurred in 2011, these prior acts are not being admitted to prove the bad character propensity or criminal tendencies of the defendant, but solely to show or to establish what the defendant's intent may have been at the time he's alleged to have committed the specific crime charged here. You may not consider the evidence of these prior acts as establishing a predisposition on the part of the defendant to commit the crime charged or to demonstrate that he has a criminal propensity to engage in criminal conduct. You may consider this evidence of these prior incidents only if you believe it occurred, and further, only if you find that it logically, rationally and conclusively bears on the issue of whether or not the defendant had the intent to commit the crime that is charged in this case.

"On the other hand, if you do not believe the evidence of these prior incidents or even if you do, if you do not find that it logically, rationally, and conclusively bears on the issue of the defendant's intent at the time of the crime charged in this case, then you may not consider this testimony relating to the incidents in the past for any purpose whatsoever. In other words, you may not allow your mind uncritically to believe that the defendant must be or is more likely to be the person who committed the crime charged in this case merely because of the misconduct he may have directed toward [the victim] previously, nor may you believe that the defendant is or is more likely to be guilty of the offense here charged merely because of the alleged prior misconduct.

"Rather, as I have explained, you are permitted to consider this evidence of prior incidents between the defendant and [the victim] as she has just described only if you believe that they occurred, and then only to the extent that you find their occurrence may bear on the issue of whether the defendant possessed the requisite intent to commit the crime alleged in this case. These alleged prior incidents may not be considered by you for any other purpose."

[8] The defendant's sister testified that she recalled two officers coming to her mother's home. The defendant's mother testified that she recalled one officer coming to her home.

[9] The language used by the court paralleled the limiting instruction it

gave the jury after the victim testified regarding the uncharged misconduct evidence. See footnote 7 of this opinion.

[10] Following his conviction of assault in the first degree, the defendant admitted that, as a result of his criminal conduct, he had violated the terms of his probation as set forth under a separate docket number. The court, *Gold, J.*, imposed an additional sentence of three years of incarceration on the violation of probation charge to be served concurrently with the sentence on the assault conviction.

[11] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[12] In his brief, the defendant argues that this court must examine both general intent and specific intent to cause serious physical injury. As part of his argument, the defendant cites *State* v. *Gilligan*, 92 Conn. 526, 536–37, 103 A. 649 (1918), and urges this court to limit the use of prior misconduct to instances in which the state's case is "reasonably consistent with a theory that the charged offense was committed innocently, i.e., by accident or mistake." The defendant contends that, because "[t]here is no imaginable interpretation of [the state's] evidence that would be consistent with accident or mistake," the uncharged misconduct evidence was not relevant to prove general intent, i.e., voluntariness of action.

The state contends, inter alia, that the defendant's argument, premised on *Gilligan*, presents a new legal ground that was not raised before the trial court and refers this court to our recent decision in *State* v. *McKinney*, 209 Conn. App. 363, 385–88, 268 A.3d 134 (2021), cert. denied, 341 Conn. 903, 268 A.3d 77 (2022). We address the defendant's argument because it relates to his claim before the trial court that the uncharged misconduct evidence was not relevant to intent.

We find the defendant's reliance on *Gilligan* to be misplaced. In so deciding, we are persuaded by our Supreme Court's rationale in *State* v. *Beavers*, 290 Conn. 386, 963 A.2d 956 (2009), in which the court stated: "We disagree . . . with the defendant's reliance on *State* v. *Gilligan*, [supra, 92 Conn. 526], wherein a convalescent home owner was convicted of murdering one of her patients by arsenic poisoning. On appeal, this court concluded that the trial court had abused its discretion when, for purposes of proving malice and intent, as well as absence of accident or mistake, it admitted into evidence the fact that three of the home's other patients also had recently died of arsenic poisoning. . . . We view the venerable *Gilligan* decision as confined to its facts, because it focuses largely on the unduly prejudicial impact of that uncharged misconduct evidence in light of the fact that the state already had introduced ample evidence of absence of mistake or accident, including that the victim had received multiple large doses of arsenic, the defendant's delay in seeking medical attention and 'unseemly haste' in getting rid of the body, the defendant's failure to notify the victim's relatives of his death, a loan of money from the victim to the defendant, and the defendant's impending need for the victim's room for another paying patient." (Citation omitted.) *State* v. *Beavers*, supra, 405–406 n.20; see also *State* v. *Gilligan*, supra, 533 ("[t]he authorities on the subject are so numerous, and the relation between the commission of one offense and of another similar offense depends so much upon the nature of the offense and on the circumstances of each case, that we confine our discussion to the crime of murder by poisoning").

[13] *State* v. *Juan J.*, supra, 344 Conn. 1, was decided after oral argument in this appeal. This court ordered both parties to file supplemental briefs addressing the impact, if any, of that decision on the present appeal, and the defendant and the state filed their briefs on July 21 and 22, 2022, respectively. In his supplemental brief, the defendant argues that *Juan J.* is controlling authority "establishing the inadmissibility of uncharged misconduct evidence to prove general intent in this case." He further argues that *Juan J.* also supports a conclusion that the uncharged misconduct evidence in the present case was inadmissible to prove specific intent because its prejudicial impact outweighed its probative value. The state argues that "[t]he rule created in *Juan J.* precluding the admission of prior misconduct evidence on the issue of intent in the prosecution of a general intent crime, where the theory of defense is that the conduct did not occur at all, does not apply factually or legally to the present case. Indeed, to conclude that admission of the prior misconduct evidence in the present case was improper under *Juan J.* would require this court to extend *Juan J.*'s holding, a result that

finds no support in our law and runs contrary to the very rationale undergirding the Supreme Court's analysis and outcome in *Juan J.*"

[14] The video recordings were admitted into evidence under the hearsay exception for medical diagnosis and treatment set forth in § 8-3 (5) of the Connecticut Code of Evidence. See *State* v. *Juan J.*, supra, 344 Conn. 10.

[15] The court in *Juan J.* rejected the state's reliance on cases involving specific intent crimes "to support the proposition that the defendant's intent in a general intent case is always in issue unless directly and explicitly admitted before the trier of fact." (Internal quotation marks omitted.) *State* v. *Juan J.*, supra, 344 Conn. 22 n.9. The court reiterated that "the state's burden of proving intent in a specific intent crime case differs significantly from its burden in a general intent crime case and unfairly borders on propensity evidence when used in such a way. The state cannot use the logic of specific intent cases to overwhelm a general intent case with uncharged misconduct." Id.

[16] In support of his argument, the defendant relies on precedent from various federal circuit courts of appeals that "employ an analysis to assist in determining whether uncharged misconduct evidence ostensibly admitted to prove one of the permissible purposes, such as intent, actually runs afoul of the impermissible purpose of showing propensity." Given the availability of appellate authority in our state, we do not find the federal cases persuasive.

[17] "The trial court has some degree of choice in balancing the probative value of uncharged misconduct evidence against its prejudicial effect . . . and . . . a different trial court might arrive at a different conclusion. We hold only that, on the present record, the trial court's decision to admit the challenged evidence was not arbitrary or unreasonable. See, e.g., *State* v. *Smith*, [313 Conn. 325, 336, 96 A.3d 1238 (2014)] ([T]he question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable.)." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 602 n.13.

───────────────